Joseph J. CICIPPIO, et al., Plaintiffs,

v.

ISLAMIC REPUBLIC OF IRAN, Defendant.

Civil Action No. 96–1805(TPJ).

United States District Court, District of Columbia.

Aug. 27, 1998.

Barbara Anne Barnes, James J. Oliver, Carla E. Connor, Murphy & Oliver, Norristown, PA, for Plaintiffs.

## DECISION AND ORDER

JACKSON, District Judge.

Three male U.S. citizens, joined by the spouses of two of them, bring this action for

damages for tortious injuries done to them in the course of their kidnapping, imprisonment and torture by agents of the Islamic Republic of Iran ("Iran") between the years 1985 and 1991 in Beirut, Lebanon. Jurisdiction is predicated upon 28 U.S.C. §§ 1330(a) and 1605(a)(7).

Iran was served with process on April 28, 1997 (see infra, n. 4), but did not respond to the complaint, and default was entered November 13, 1997. The case was therefore tried ex parte to this Court, sitting without a jury, on July 20–21, 1998. Upon the evidence adduced at trial, from which the facts set forth below are found pursuant to Fed. R.Civ.P. 52(a), the Court concludes that judgments shall be given for plaintiffs.

I.

In the mid–1980's all five plaintiffs were civilians residing in Beirut, Lebanon. David Jacobsen, 54 years of age in 1985 and unmarried, was the chief executive officer of the American University of Beirut Medical Center.[1] In 1986, Joseph Cicippio, 56 years old, was comptroller of the American University of Beirut and its hospital, and had recently married plaintiff Elham Cicippio, then a Lebanese citizen. Frank Reed, aged 51 in 1986, owned and operated two private schools in Beirut with a Lebanese partner. Fifi Dalati–Reed, his wife, was a teacher. None had any connection whatsoever with the U.S. government.

Beginning in May of 1985, each man was independently assaulted, subdued, and abducted by several armed male assailants while on public thoroughfares in the vicinity of their homes or offices. Each was held prisoner separately, at various locations in Beirut or its environs, under similar abject conditions. Their captors have been identified as members of Hizballah, a politico-paramilitary organization sponsored, financed, and controlled by Iran. Hizballah's mission was to exploit the disorder in Lebanon following the Israeli military incursion of 1982 and to diminish American influence in the region. Hizballah was and is a terrorist organization, and Iran is recognized officially as a state sponsor of acts of terrorism, including kidnapping and hostage-taking.[2]

Jacobsen was held in captivity for 532 days, nearly a year and a half. Reed was held for 1330 days, over three and a half years. Cicippio remained a prisoner the longest, 1908 days, or five years and three months.

At trial, each of the three former hostages testified in detail about his ordeal and the inhumane treatment he received. See Tr. July 20, 1998 (hereinafter "July 20 Tr.") at 22–68 (Jacobsen); July 20 Tr. at 93–125 (Reed); Tr. July 21, 1998 (hereinafter "July 21 Tr.") at 11–46 (Cicippio). The following summaries do not do full justice to their accounts.

II.

*David Jacobsen*

Shortly before 8:00 a.m. on May 28, 1985, Jacobsen was walking with a companion between the American University of Beirut campus and the Medical Center. As they crossed an intersection, a van pulled beside them, and two or three men grabbed Jacobsen from behind while another man with a gun fought with the companion. The assailants forced Jacobsen into the van, pistol-whipped, bound and gagged him, and pushed

---

**1.** The American University of Beirut is owned by a private non-profit corporation, incorporated and with headquarters in New York. (Testimony of David Jacobsen, Tr. of July 20, 1998, p. 23)

**2.** Testimony of Col. David W. Hurley, USMC, Director of Intelligence for the U.S. Marine Corps (Tr. of July 20, 1998, pp. 9–22) Testimony of Dr. Patrick L. Clawson, Director of Research, Washington Institute for Near East Policy, Tr. of July 20, 1998, pp. 70–92; plaintiffs' exhibits 21–30.

Iranian government officials negotiated directly with U.S. National Security Advisor Robert McFarland and Col. Oliver North, USMC, of the U.S. National Security Council, in Teheran, Iran, in May, 1986, over the release of Jacobsen. Iran demanded an exorbitant ransom which the United States refused to pay, and he remained in captivity.

In November, 1986, Col. North was personally alerted by an Iranian official to Jacobsen's imminent release and was thus able to be present when it occurred. (Testimony of Oliver North, Tr. of July 21, 1998, pp. 3–9).

him into a hidden compartment under the floor of the back of the van.

Jacobsen was held captive with several others, in darkness or blindfolded, for 18 months. During that entire time, he says, he was able to see the sunlight twice and the moon once. His captors kept Jacobsen chained by his ankles or wrists, wearing nothing but undershorts and at-shirt. Meals consisted of pita bread and a bit of dry cheese for breakfast, a bowl of rice with a dehydrated soup sauce for lunch, and a piece of bread for dinner. Sometimes his guards would spit into his food before serving him.[3]

In addition to the physical suffering caused by the conditions of confinement, Jacobsen and his fellow prisoners were subjected to regular beatings on all parts of their bodies. Jacobsen was frequently confronted with the prospect of imminent death; at any time a guard might put a gun to his head and threaten to kill him. His captors interrogated him incessantly, accusing him of working for the C.I.A. (which he did not), in the course of which he would be intermittently beaten as well. Although blindfolded, he could overhear other hostages suffering as he was, including the moments of their deaths, constantly fearing that he might be next. He heard the death throes of fellow hostage William Buckley, and listened as well as a French hostage died of his infirmities and another was executed by gunshot.

As with all the former hostages, the looming uncertainty of the future was a constant demoralizing force for Jacobsen: unlike sentenced criminals, he observed, a hostage is aware only of how long he has been held; he knows nothing as to when, if ever, he will be released. On four occasions Jacobsen's captors intimated that they would release him shortly, only to continue his imprisonment without explanation.

On November 2, 1986, Jacobsen was finally released. Since his release, Jacobsen has been under continuous treatment for post-traumatic stress disorder resulting from his captivity. *See* Pls.' Ex. 18 (Report of Dr. Calvin Frederick of July 16, 1998).

*Frank Reed*

Frank Reed was abducted in Beirut while on his way to meet his wife for lunch on September 9, 1986. He was held at gunpoint, then thrown into the back of a car and taken to a hideout where he was beaten for several days as a suspected C.I.A. agent. Reed, too, was subjected daily to torture and threats of death. He was kept in solitary confinement for two years, blindfolded and chained to the wall or floor. He contracted persistent eye infections from the blindfold, and scars remain on his wrist to this day from the manacles. For part of his captivity, Reed was held in a six foot-by-six foot room with only rodents for company. During the entire 44 months of his captivity, Reed says, he was never permitted to stand erect; he was constantly shackled in a stooped position.

Because Reed attempted to escape on two occasions, his captors considered him a hard case and punished him accordingly. They tightened his chains to deter future escape attempts. After one escape attempt, electric shocks were administered to his hands and he was forced to kneel on spikes. His captors battered his feet with iron bars. To this day, Reed says, he has no sensation in his feet. He can stand or walk only for short periods. Following his second escape attempt, his guards struck him in the kidneys with a rifle, and for days afterwards his urine was bloody. One guard struck him multiple times on each side of his head with a hand grenade, permanently damaging his hearing. His captors broke Reed's jaw and nose, turned him upside down and beat the soles of his feet with a belt. On another occasion he was kicked in the ribs so forcefully that the bones pierced his skin. One of Reed's captors placed boiling tea kettles on his shoulders, the scars of which remain today.

Reed calculates he was moved about the city 18 times in the course of his captivity, transported in a narrow secret compartment

---

**3.** This diet, Jacobsen believes, led to frequent gastrointestinal problems, such as excruciating cramps and diarrhea, and rectal bleeding. Upon returning home, Jacobsen also discovered he had microscopic blood in his urine, which he attributes to the regular beatings he sustained during captivity. *See* July 20 Tr. at 64.

in the bed of a truck, with his arms taped to his side and his mouth gagged. When he was moved, Reed never knew where his captors were taking him or whether he was about to be executed. His greatest fear throughout his captivity was that he would die in solitude, with none of his loved ones aware of his fate.

Reed was released on April 30, 1990. He was taken to Wiesbaden Hospital in Germany and then returned to the United States, where he remained hospitalized at Andrews Air Force Base for 80 days. His doctors discovered that Reed suffered from arsenic poisoning. See Pls.' Exs. 8B, 8E. Apparently his captors had laced his food with arsenic for a long period of time, including a large dose before he was released. Since his release, Reed has been in the hospital eleven times and has been treated for severe depression six times. Mrs. Reed testified that as a result of his captivity, her husband is still being medicated for post-traumatic stress disorder and that he has been impotent ever since. See July 20 Tr. at 138–39, 141–42.

### Joseph Cicippio

Early in the morning of September 12, 1986, while leaving his faculty apartment on the lower campus of the university, Cicippio was approached by a group of three or four young men who asked who he was, and then proceeded to attack him. The assailants pistol-whipped him about the head until he lost consciousness, and then took him to a dwelling he believes to have been in the vicinity of the airport. He was stripped, then given only a robe to wear, and left bleeding, dizzy, and in severe pain.

Cicippio was held imprisoned for the next 1,908 days. He was subjected to terrifying interrogation. Convinced that Cicippio worked for the C.I.A. because he remained in Lebanon after most other Americans had left, his captors sought to force a confession from him by a grisly game of Russian roulette: a revolver was placed to his head with a single bullet in the cylinder. Each denial of a C.I.A. connection produced a pull of the trigger. He was also threatened with castration.

Cicippio, too, was randomly beaten throughout his captivity and forced to watch fellow captives being beaten. "You never knew when or where it would happen over the years," he testified. "It could happen almost at any hour, day and night." July 21 Tr. at 42. He lived in a constant state of fear.

The terrorists kept Cicippio completely isolated from the outside world. He was confined in rodent- and scorpion-infested cells, and for virtually his entire time in captivity he was bound by chains. Cicippio lost over sixty pounds during his ordeal. During one entire winter he was chained outdoors on an upper-story apartment balcony, exposed to the elements, from which he developed frostbite to both his hands and feet, the effects of which he retains today.

Cicippio suffered from numerous medical problems while in captivity. At one point he was subjected to a surgical procedure in an unknown hospital for an unidentified abdominal problem, the nature of which, to this day, he does not know, other than that he has a ten-inch scar on his abdomen as a memento. A slight stutter, a speech impediment that antedated his capture, was exacerbated by his captivity.

### Fifi Delati–Reed and Elham Cicippio

The wives of the hostages suffered as well. See July 20 Tr. at 126–43 (Mrs. Reed), 144–59 (Mrs. Cicippio). Fifi Delati–Reed had no independent financial resources and had to find means of support for herself and their young son during her husband's captivity. She also testified as to her own mental anguish in the total absence of information about her husband's fate. Once Reed had returned, however, the worst of her ordeal began. She was forced to cope with the drastic changes in her husband's personality wrought by his captivity. His behavior became increasingly erratic, and in due course Mrs. Reed was compelled to have him involuntarily committed to a mental hospital for treatment, a measure that caused her yet more distress. Mrs. Reed acknowledged that she and her husband have had no marital relations since his release. July 20 Tr. at 142.

Elham Cicippio also testified as to the difficulty of enduring her husband's captivity with no news of him except such occasional macabre reassurance she took that he was probably still alive from his captors' public threats to execute him. She felt helpless, not knowing what, if anything, she might do to procure her husband's release. Extortionists promised to help free her husband if she paid them money, and she did, exhausting her savings before realizing she had been defrauded. On one occasion she appeared on Lebanese television to plead with the captors not to execute her husband.

### III.

■ This Court concludes that it has *in personam* jurisdiction over defendant Iran pursuant to 28 U.S.C. § 1330(b), service of process having been properly made pursuant to 28 U.S.C. § 1608.[4]

Notwithstanding the entry of default against the defendant, however, before this Court may enter a judgment against a foreign state, plaintiffs must "establish[ ] [their] claim or right to relief by evidence satisfactory to the [C]ourt." 28 U.S.C. § 1608(e). *See also Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 6 (D.D.Cir.1998); *Alejandre v. Republic of Cuba,* 996 F.Supp. 1239, 1242 (S.D.Fla.1997).

■ As this is an action brought against a sovereign foreign state, the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–1611, determines the extent of the defendant's amenability to the judicial process of the United States. *See Flatow,* 999 F.Supp. at 10–11 (citing *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 489, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)). Title 28 U.S.C. § 1330(a), gives U.S. district courts original subject matter jurisdiction over civil actions with respect to which a defendant foreign state is not entitled to immunity under the FSIA. *See Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989).

■ In general, the FSIA affords foreign states immunity from the jurisdiction of U.S. courts, with exceptions made for claims of a particular nature. *See* 28 U.S.C. § 1604. One of these exceptions is found at 28 U.S.C. § 1605(a)(7). Enacted as an amendment to the FSIA in 1996, § 1605(a)(7) enables U.S. courts to entertain cases brought directly against a sovereign foreign state, once it has been formally designated by the U.S. Department of State as a state sponsor of terrorism, that either commits a terrorist act (including "hostage taking" and "torture") on its own, or provides material support to the perpetrators of such an act, which results in the death of or injury to an American citizen. *See also Flatow,* 999 F.Supp. at 12.[5]

---

**4.** 28 U.S.C. § 1608(a) sets forth the procedure for service of process on a foreign state. Service in this case was effected on April 28, 1997 through the Embassy of Switzerland in Tehran, which delivered the summons, complaint, and notice of suit to the Ministry of Foreign Affairs of Iran. Service was confirmed by the U.S. Department of State in a letter from M. Grace Michaud, Consular Affairs Officer, Office of American Citizen Services, Near East and South Asia Division, to the Clerk of this Court, filed July 9, 1997.

**5.** For purposes of § 1605(a)(7), "torture" is defined as:

any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering ..., whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having commit-

ted, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

Torture Victims Protection Act of 1991, Pub.L. No. 102–256, § 3(b)(1), 106 Stat. 73, 73 (reprinted at 28 U.S.C.A. § 1350 note (West Supp.1997)).

The statutory definition of "hostage taking" is supplied by treaty:

Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of taking of hostages ("hostage-taking") within the meaning of this Convention.

International Convention Against the Taking of Hostages, *opened for signature* December 18, 1979, art. 1, T.I.A.S. No. 11081 (entered into force for the United States on January 6, 1985).

## IV.

The evidence establishes that the United States Department of State has recognized Iran as a state sponsor of terrorism since January of 1984. *See* 49 Fed.Reg. 2836–02 (Jan. 23, 1984 statement of George P. Shultz, Secretary of State); *see also Flatow,* 999 F.Supp. at 9. United States intelligence publications specifically identify Iran as an avowed sponsor of Hizballah (and Hizballah, incidentally, as the kidnappers of David Jacobsen, Frank Reed, and Joseph Cicippio). *See* Pls.' Ex. 21 ("Terrorist Group Profiles," the Vice President's Task Force on Combatting Terrorism report of November 1988); *see also* Pls.' Exs. 24–30 (U.S. Department of State "Patterns of Global Terrorism" reports, 1986–88, 1990–92, 1997). Expert testimony at trial concurred in that conclusion. *See* July 20 Tr. at 15–16, 18, 74; July 21 Tr. at 4–7 (testimony of Cols. Hurley and North, and Dr. Clawson, *supra,* n. 2).

Whether or not the evidence is sufficient to find that Iran seized these hostages on its own, however, it nevertheless openly provided "material support or resources" to Hizballah, and that is sufficient grounds to impose liability under § 1605(a)(7). *See* 18 U.S.C. § 2339A(b) (defining "material support or resources"). Dr. Clawson estimated that during the time in which the plaintiffs were held hostage, Iran spent between $100 million and $150 million annually in support of terrorist activities. *See* July 20 Tr. at 81. Colonel Hurley also testified that Iran provides military training for the Hizballah, *see* July 20 Tr. at 19–20, and, in his opinion, remains to this day the most active state sponsor of terrorism, specifically targeting Americans abroad. *See* July 20 Tr. at 17–18; *see also*

Pls.' Ex. 30 (U.S. Department of State's "Patterns of Global Terrorism: 1997" report). Dr. Clawson declared that the taking of these hostages could not have happened without approval from the highest levels of the Iranian government. *See* July 20 Tr. at 91; *see also* July 20 Tr. at 20 (testimony of Col. Hurley).[6]

## V.

■ The Court also concludes that the evidence presented establishes *prima facie* the plaintiffs' claims against the Islamic Republic of Iran, and that no colorable defense is apparent from the record as a matter of law.

To summarize, plaintiffs have proved to the Court's satisfaction: (1) that they were injured by acts of torture and hostage-taking; (2) that the acts were perpetrated by a group receiving material support from Iran; (3) that the provision of material support was engaged in by Iranian officials, employees, or agents acting within the scope of their office, employment, or agency; (4) that at the time of the acts, Iran was designated as a state sponsor of terrorism under 50 U.S.C.App. § 2405(j) or 22 U.S.C. § 2371; (5) that the claimants or victims were U.S. nationals at the time the acts occurred;[7] and (6) that similar acts conducted by officials, employees, or agents of the U.S. while acting within the scope of his or her office, employment, or agency, would also be actionable.[8]

■ Although the abductions of Cicippio, Reed, and Jacobsen occurred more than a decade prior to the enactment of 28 U.S.C. § 1605(a)(7), Congress expressly directed

6. "The law of *respondeat superior* demonstrates that if a foreign state's agent, official or employee provides material support and resources to a terrorist organization, such provision will be considered an act within the scope of his or her agency, office, or employment." *Flatow,* 999 F.Supp. at 18 (citing *Guzel v. Kuwait,* 818 F.Supp. 6, 10 (D.D.C.1993)).
  It is unnecessary to prove that the support provided by Iran to Hizballah contributed directly to the seizures of Jacobsen, Cicippio and Reed. *See id.* ("Sponsorship of a terrorist group which causes the personal injury or death of a United States national alone is sufficient to invoke jurisdiction.").

7. *See* 28 U.S.C. § 1605(a)(7)(B)(ii). The victims in this case, Joseph Cicippio, David Jacobsen, and Frank Reed were U.S. citizens at the time they were abducted. Since their husbands were victims, the Court also has jurisdiction over the claims of Elham Cicippio and Fifi Delati–Reed.

8. *See* U.S. Const. Amend. 5; *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *see also* 18 U.S.C. §§ 1203, 2339A, 2339B, 2340A.

that the statute be given retroactive application. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, § 221(c), 110 Stat. 1214, 1243 (reprinted at 28 U.S.C.A. § 1605 note (West Supp.1997)). Similarly, to the same effect, the ten-year statute of limitations for actions under § 1605(a)(7) does not bar the claims in this case because, once again, Congress has provided that victims of terrorism be given benefit of "all principles of equitable tolling, including the period during which the foreign state was immune from suit . . . ." 28 U.S.C. § 1605(f). Iran was immune from suit by these plaintiffs under the FSIA until the enactment of § 1605(a)(7) in 1996.[9]

## VI.

■ Joseph Cicippio, Frank Reed, and David Jacobsen were "tortured" and "taken hostage" as those terms are defined by 28 U.S.C. § 1605(e). Those acts of torture and hostage-taking, all clearly actionable as tortious conduct under U.S. law,[10] thus inflicted legally cognizable, profoundly serious, and largely permanent personal injury upon each of the hostages and their spouses. *See* July 20 Tr. at 22–68; 93–125; July 21 Tr. at 11–46; *see also* Pls.' Exs. 8, 10, 17, 18.

Under 28 U.S.C. § 1606, for any claim against a foreign state as to which the foreign state is not entitled to immunity, the foreign state "shall be liable in the same manner and to the same extent as a private individual under like circumstances . . . ." The statute continues, however to provide that " . . . a *foreign state* . . . shall not be liable for punitive damages." (Emphasis supplied). Accordingly, the Court must undertake the difficult task of calculating an award of compensatory damages to make plaintiffs whole, while nevertheless avoiding any punitive component that would surely accompany a compensatory award were the defendant at bar not possessed of statutory immunity. There appear to be no truly analogous domestic precedents to assist the Court in doing so.[11]

Prior to his capture, Jacobsen had a promising career in medical administration. After his release, Jacobsen was unable to find a job; prospective employers were reluctant, he discovered, to hire someone who had undergone such an ordeal. *See* July 20 Tr. at 46. Jacobsen estimated that he lost approximately $2.9 million in earnings as a result of his captivity. *See* Pls.' Ex. 38 (calculating loss of income based on his $125,000 salary plus ten percent increase annually at time of kidnapping plus loss of his retirement plan and loss of savings during captivity).

At the time he was kidnapped, Frank Reed was a partner in the operation of two successful private schools outside Beirut. He earned a salary of $100,000 per year and owned 25% of the property and the business, which he estimates were worth $5 million in the aggregate. Reed testified that as a result of his captivity, he lost everything he owned in Lebanon. *See* July 20 Tr. at 95–97. Due to the severity of the beatings he suffered while held hostage, Reed has been declared permanently disabled and unable to work because of his severe depression and his permanently injured feet. *See* July 20 Tr. at 123–24. His income has been reduced to a monthly social security disability payment of $625. He calculates that he has lost fifteen years of work, plus his 25% share of the schools and their profits, altogether total-

---

**9.** *See Cicippio v. Islamic Republic of Iran,* 30 F.3d 164 (D.C.Cir.1994).

**10.** The complaint is drawn in ten counts: three allege tortious conduct, including assault, battery, false imprisonment, and kidnapping (Counts I, V, and VII); three allege violations of "international human rights" (Counts II, VI, and VIII); two allege loss of consortium (Counts III and XI); and two allege intentional and/or negligent infliction of emotional distress (Counts IV and X).

**11.** In *Langevine v. District of Columbia,* 106 F.3d 1018 (D.C.Cir.1997), the D.C. Circuit upheld a jury verdict of $200,000 for bodily injury, pain and suffering resulting from a false arrest and detention in a D.C. police station that lasted no more than a day.

In the only two reported cases to have been brought under § 1605(a)(7) in which damages have been awarded,— *Flatow* and *Alejandre v. Republic of Cuba,* 996 F.Supp. 1239 (S.D.Fla. 1997)— two district courts awarded compensatory damages of $10 million and $8 million, respectively, for wrongful deaths resulting from acts of terrorism.

**70**

ing in excess of $2.7 million. *See* July 20 Tr. at 124.

Elham Cicippio testified that her husband was unable to find a job in the United States until approximately 1994. *See* July 20 Tr. at 148–49. Additionally, Joseph Cicippio testified that his loss in salary during the time he was held hostage totals $850,000. *See* July 21 Tr. at 42–43.

The Court concludes that plaintiffs David Jacobsen, Frank Reed, and Joseph Cicippio are entitled to damages for lost wages and business opportunities in the amounts of $2.9 million, $2.7 million, and $850,000, respectively. In addition, plaintiffs are entitled to compensatory damages for pain and suffering and mental anguish.

The Court will award damages to, and cause judgments to be entered for David Jacobsen in the amount of $9.0 million; for Frank Reed in the amount of $16.0 million; and for Joseph Cicippio in the amount of $20.0 million.

Mrs. Cicippio and Mrs. Reed were denied their husbands' society and companionship for 63 and 44 months, respectively. They endured those months in great distress, never knowing if their husbands were being tortured or were even still alive. Even today they continue to suffer from the changes that prolonged captivity and abuse produced in their husbands. In short, they have already endured many years of mental anguish that may have exceeded the grief normally experienced as a result of the death of a loved one, and will in all likelihood continue to do so into an uncertain future. Accordingly, Elham Cicippio and Fifi Delati–Reed are awarded damages and shall each have judgment for $10 million.

It is, therefore, this 27th day of August, 1998,

ORDERED, that the Court finds in favor of the plaintiffs Joseph J. Cicippio, Elham Cicippio, Frank Reed, Fifi Delati–Reed, and David P. Jacobsen, and against the defendant Islamic Republic of Iran; and it is,

FURTHER ORDERED, that the Clerk of this Court forthwith enter judgments against

the Islamic Republic of Iran for plaintiffs in the following amounts:

| | |
|---|---|
| Joseph J. Cicippio: | $20,000,000.00 |
| Elham Cicippio: | $10,000,000.00 |
| Frank Reed: | $16,000,000.00 |
| Fifi Delati–Reed: | $10,000,000.00 |
| David P. Jacobsen | $ 9,000,000.00 |