Joseph M. **JENCO,** Personal Representative of the Estate of Lawrence M. Jenco, et al., Plaintiffs,

v.

**ISLAMIC REPUBLIC OF IRAN,** and the Iranian Ministry of Information and Finance, Defendants.

No. CIV A 00–549 RCL.

United States District Court, District of Columbia.

Aug. 2, 2001.

Steven Perles, Thomas Fortune Fay, Washington, DC, for plaintiffs.

### MEMORANDUM OPINION

LAMBERTH, District Judge.

On March 15, 2000, the plaintiffs [1] filed a multi-count complaint alleging that the defendants were responsible for Lawrence M. Jenco's kidnapping, detention, and torture over a 1½ year period. The defendants, despite being properly served with process, failed to answer this charge in any way. Thus, the Court entered the defendants' default on January 5, 2001.

Notwithstanding this entry of default, a default judgment against a foreign state may not be entered until the plaintiffs have "establishe[d] [their] claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e). Thus, the Court held a bench trial to receive evidence from the plaintiffs. Again, the defendants failed to appear.

Based on the evidence presented to the Court, and the law applicable to this case, the Court finds a default judgment merited. Further, the Court awards appropriate compensatory relief. Finally, the Court finds that the Estate of Fr. Jenco is entitled to punitive damages.

## I. FINDINGS OF FACT

### A. Father Jenco's Experience [2]

In early 1985, Lawrence M. Jenco, an ordained priest in the Catholic church, was working in Beirut, Lebanon as the Director of Catholic Relief Services. On the morning of January 8, he was abducted by five armed men and imprisoned for the next for 564 days. After his release, he returned to the United States and served as a parish priest until his death on July 19, 1996.

From the moment he was abducted, Father Jenco was treated little better than a caged animal. He was chained, beaten, and almost constantly blindfolded. His access to toilet facilities was extremely limited, if permitted at all. He was routinely required to urinate in a cup and maintain the urine in his cell. His food and clothing were spare, as was even the most basic medical care

He also withstood repeated psychological torture. Most notably, at one point, his captors held a gun to his head and told him that he was about to die. The captors pulled the trigger and laughed as Father Jenco reacted to the small click of the unloaded gun. At other times, the captors misled Fr. Jenco into thinking he was going home. They told him to dress up in his good clothes, took pictures of him, and then said "ha, ha, we're just kidding." Fr. Jenco Interview, Plaintiffs' Exhibit 21, at 93.

Even after his release and return to the United States, Fr. Jenco continued to suffer the effects of his captivity. For a

---

1. When originally filed on March 15, 2000, the only named plaintiff in this case was the Estate of Lawrence M. Jenco. After trial, the plaintiff, pursuant to Federal Rule of Civil Procedure 15(b), amended the complaint to conform with the evidence presented at trial. The complaint was amended to include the brothers, sisters, nephews, and nieces of the decedent Lawrence Jenco. Further, since the trial, the plaintiffs have adduced additional evidence of the pain and suffering of the Fr. Jenco's relatives. The Court has considered this additional evidence in making its decision.

2. As a co-hostage of, for example, Terry Anderson and Thomas Sutherland, Fr. Jenco's experience was substantially similar to their experiences. Thus, for further description of Fr. Jenco's experience, *see Anderson v. The Islamic Republic of Iran*, 90 F.Supp.2d 107, 113 (D.D.C.2000); *Sutherland v. The Islamic Republic of Iran*, 151 F.Supp.2d 27; *Cicippio v. The Islamic Republic of Iran*, 18 F.Supp.2d 62, 68 (D.D.C.1998). *See also* Fr. Lawrence M. Jenco, Bound to Forgive (1995); Plaintiffs' Exhibit 21 (post-captivity interview with Fr. Jenco); Terry Anderson, Den of Lions (1993); Thomas Sutherland & Jean Sutherland, At Your Own Risk (1996).

long period after his return, Father Jenco remained underweight and quite weak. Father Jenco's nephew, David Mihelich, testified that his uncle's disposition was noticeably milder, and indeed never returned to its pre-captivity state. As well, Christopher Morales, a Special Agent with the United States Secret Service, became a close friend of Jenco's after interviewing him about his experience in Lebanon. Agent Morales testified that he witnessed Father Jenco have three separate "flashbacks", that is, moments where Jenco appeared to be aloof of his surroundings and somewhat possessed and disturbed by different images or experiences. *See* Feb. 15, 2001 Tr. at 10–13.

In sum, the last 11 years of Fr. Jenco's life were indelibly marred by his kidnapping and torture. With that established, the Court turns to the next issue: who were his captors?

## B. Father Jenco's Captors and Their Connections to the Iranian Government

The testimony of numerous witnesses at trial convinces the Court that Father Jenco's captors were members of the Islamic group Hizbollah and that Hizbollah was funded and controlled by the Iranian government and the Iranian Ministry of Information and Security.

### 1. Fr. Jenco's Captors

Based on the evidence presented at trial, it is clear that Fr. Jenco was kidnapped and detained by the Islamic fundamentalist group Hizbollah. This conclusion is supported by the testimony of several witnesses. For example, Jenco's co-hostage, Terry Anderson, testified that their captors were "very, very pro-Iranian," and that Iranian Revolutionary Guards were involved in the kidnapping and detention of the hostages. *See* Tr. at 116. Anderson further testified that he and his co-hostages knew that they were being held in Hizbollah territory, and at one point, were even held at Hizbollah headquarters. *See* Tr. at 116. Moreover, several years after his release, Anderson interviewed the secretary general of Hizbollah who as much as admitted to the kidnappings. *See* Tr. at 118. Thomas Sutherland, another co-hostage of Jenco's, also testified as to the identity of his captors. The captors, according to Sutherland, were clearly part of an Islamic Jihad group, who, when the death of the Ayatollah Khomeini was reported, wept quite openly. *See* Tr. at 238.

Perhaps that most persuasive evidence that Jenco's captors were members of Hizbollah came from Ambassador Robert Oakley and Dr. Patrick Clawson. Oakley, a former advisor to the National Security Council on Middle East affairs, testified bluntly on this subject. Consider the following colloquy from trial:

Q. Is there any doubt in your mind [Ambassador Oakley] that through that period of 1985 through 1991 that the Hizbollah, backed by Iran, financially and otherwise, was holding Tom Sutherland as a hostage?

A. No, there [is] none.

*See* Tr. at 21. Dr. Patrick Clawson, an experienced researcher and writer on Iranian politics, testified similarly. When asked by the Court whether Sutherland, Jenco's co-hostage, was "initially seized by Hizbollah ... and held by them throughout the time?", Clawson responded "Yes, your Honor." Tr. at 58.

Further support for the conclusion that Fr. Jenco was captured and detained by Hizbollah is provided by precedent. For instance, in *Anderson v. The Islamic Republic of Iran*, 90 F.Supp.2d 107, 113 (D.D.C.2000), the Court found that Terry Anderson, Sutherland's co-hostage for al-

most his entire captivity, was captured by Hizbollah and that "Iran provided Hizbollah[3] with funding, direction and training for its terrorist activities in Lebanon, including the kidnapping and torture of Terry Anderson." *See also Cicippio v. The Islamic Republic of Iran,* 18 F.Supp.2d 62, 68 (D.D.C.1998) (finding that Hizbollah was responsible for the kidnapping and detention of David Jacobson, a co-hostage of Sutherland, Anderson, and Jenco).

### 2. Hizbollah's Connection to the Iranian Government

In addition to finding that Fr. Jenco was seized by Hizbollah, the Court also finds that The Islamic Republic of Iran and the Iranian MOIS provided support, guidance, and resources to Hizbollah. The most persuasive testimony on this issue came from Jenco's experts: Ambassador Oakley, Robert McFarlane, and Dr. Clawson. Ambassador Oakley testified that "radical elements highly placed within the government of Iran are giving operational policy advice to terrorists in Iran, specifically terrorists operating under the name Islamic Jihad or Hizbollah." Tr. at 19. Similarly, Robert McFarlane, former National Security Advisor, testified that Hizbollah was a "terrorist group . . . formed in the early 1980s under the sponsorship of the government of Iran." Tr. at 29; *see also* Tr. at 31 (opining that Hizbollah was formed with the "volunteering of [Iranian] financial support" as well as "Iranian personnel"). As well, Dr. Clawson testified that the Iranian government and the Iranian MOIS were behind the formation and funding of Hizbollah, and that Hizbollah is very much under the control of the Iranian government. *See* Tr. at 41–42. Finally, Middle East expert Dr. Reuven Paz

testified that almost all of Hizbollah's activities—whether social, religious, or terrorist—were funded by the Iranian government. Dr. Paz added that the Iranian government also provides Hizbollah substantial non-financial support, such as arms and ammunition. *See* Videotape Testimony of Ruven Paz, Feb. 7, 2001.

### C. The Pain and Suffering of Father Jenco's Family

While Father Jenco was being held prisoner, his many siblings and relatives banded together and fought for his release. The family made a practice of meeting every Monday night to discuss what steps they could take to help secure his release. Family members took on various responsibilities, such as communicating with the public, dealing with the media, maintaining contact with the State Department, and raising money to cover the various costs of such a massive effort.

Andrew Mihelich and John Jenco, both nephews of Fr. Jenco, testified that, because of their massive dedication to free Fr. Jenco, the whole family, in effect, became a hostage in one way or another. As a result, many of the traditional family events, such as birthdays, graduations, or religious holidays were overshadowed-or overlooked altogether-on account of the campaign to free Fr. Jenco. Apart from the campaign, the family felt the very personal loss of not having their beloved relative at many family milestones, such as weddings, births, and baptisms. On the whole, according to John Jenco, the family spent the 19 months of Fr. Jenco's captivity on an emotional roller coaster, never knowing how close or far Fr. Jenco was to being released, not to mention returning home unharmed.

---

**3.** There does not appear to be a consensus on the spelling of "Hizbollah", as it is often spelled "Hezbollah" as well.

Jenco relatives also testified as to the specific effects that the captivity had of Fr. Jenco's brother, John Jenco. John Jenco Jr. testified that, from the first day of captivity to the last day of his own life, John Jenco Sr. was distraught in a way he had never been before. He was able to celebrate the return of Fr. Jenco, but was never fully able, according to John Jenco Jr., become himself again. Similarly, Joseph Jenco testified that the stress of the captivity on Verna Mae Mihelich likely was a factor in her premature death.

## II. CONCLUSIONS OF LAW

Based on the events described above, the plaintiffs make the following allegations:

(1) The estate of Fr. Jenco alleges battery, assault, and false imprisonment.

(2) All plaintiffs allege the intentional infliction of emotional distress.

Given these claims, the Court is faced with the following three questions, which it answers in the order presented:

(1) Are The Islamic Republic of Iran and the Iranian MOIS, immune under the Foreign Sovereign Immunities Act from the alleged claims?;

(2) Are the Islamic Republic of Iran and the Iranian Ministry of Information and Security (if not immune) liable under the claims alleged?; and

(3) If the defendants are found liable, to what damages are the plaintiffs entitled?

### A. Foreign Sovereign Immunity [4]

The Foreign Sovereign Immunities Act ("FSIA") grants foreign states and their agents immunity from liability in United States courts. *See* 28 U.S.C. § 1602 *et seq.* In 1998, however, Congress specifically suspended this immunity for personal injuries "caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for such an act." [5] 28 U.S.C. § 1605(a)(7). The injurious act (or the provision of resources in support thereof), to give rise to liability, must be committed by "an official, employee, or agent of a foreign state, while acting within the scope of his or her office." 28 U.S.C. 1605(a)(7).

■ The Court finds that, based on the evidence presented at trial and recounted above, Lawrence M. Jenco was taken hostage and tortured within the meaning of 28 U.S.C. § 1605(a)(7). That Fr. Jenco was taken hostage and detained for 19 months is, of course, patently undeniable. With respect to torture, the Court finds that the deprivation of adequate food, light, toilet facilities, and medical care for 564 days amounts to torture within the meaning of section 1605(a)(7). [6]

---

4. In cases such as this one, courts have sometimes referred to the immunity issue as a jurisdictional issue. *See, e.g., Elahi v. Islamic Republic of Iran,* 124 F.Supp.2d 97, 105 (D.D.C.2000). In FSIA cases, they are one in the same. As the Supreme Court explained: "Under the [FSIA], a foreign state is presumptively *immune* from the *jurisdiction* of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) (emphasis added).

5. Although this statute was passed after the events described in this case, Congress explicitly made the statute applicable to pre-enactment conduct. *See* Pub.L. No. 104–132, § 221(c) (stating that the statute "shall apply to any cause of action arising before, on or after the date of enactment of this Act"). *See also Flatow,* 999 F.Supp. at 13.

6. From a statutory construction perspective, "torture", as used in the context of 28 U.S.C. 1605(a)(7), must have a meaning independent of "hostage taking". *See Babbitt v. Sweet Home Chapter of Communities for a Great*

■ The Court next finds that, based on the evidence presented at trial and recounted above, Fr. Jenco was kidnapped by the Islamic fundamentalist group Hizbollah and that the Islamic Republic of Iran and the Iranian MOIS provided "material support or resources" to Hizbollah within the meaning of 28 U.S.C. § 1605(a)(7). This conclusion is squarely buttressed by precedent.[7]

In summary, the Court finds that Fr. Lawrence Jenco was taken hostage and tortured by the Islamic fundamentalist group Hizbollah. The Court further finds that the defendants, The Islamic Republic of Iran and the Iranian MOIS, "provi[ded] ... material support or resources ... for [these] acts." 28 U.S.C. § 1605(a)(7). The Court also finds that the provision of resources was an act committed by "an official, employee, or agent of a foreign state, while acting within the scope of his or her office." 28 U.S.C. 1605(a)(7). Based on these findings, the Court therefore concludes that the defendants are not immune from liability in this Court.

## B. Liability

Under 28 U.S.C. § 1606, a "foreign state ... not entitled to immunity ... shall be liable in the same manner and to the same extent as a private individual under like circumstances." Applying standard rules of liability, the Court finds the defendants liable on most, but not all, counts alleged in the plaintiffs' complaint. In making this conclusion, the Court applies federal common law. *See Flatow v. The Islamic Republic of Iran*, 999 F.Supp. 1, 14–15 (D.D.C.1998) (choosing federal common law after a federal choice of law analysis).

### 1.· Battery

■ According to the Restatement (Second) of Torts, a defendant has committed battery if "he acts intending to cause a harmful or offensive contact with [a] person", and a "harmful contact with the person ... directly or indirectly results." Restatement (Second) of Torts, § 13 (1965); *see also Sphere Drake Ins. P.L.C. v. D'Errico*, 246 F.3d 682, 2001 WL 135670, at *2 (10th Cir.2001); *United Nat. Ins. Co. v. Penuche's, Inc.*, 128 F.3d 28, 32 (1st Cir. 1997).

Based upon the evidence presented in open court, the Court finds that Lawrence M. Jenco suffered harmful contact, and that that contact was the result of intentional acts attributable to both the Islamic Republic of Iran and the Iranian MOIS. Thomas Sutherland and Terry Anderson testified as to the typical treatment of

---

*Oregon*, 515 U.S. 687, 698, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). Thus, the pains normally attendant to being a hostage, most notably the loss of liberty and contact with loved ones, although clearly *tortuous* within the common meaning of the term, cannot qualify as torture under 28 U.S.C. 1605(a)(7).

7. In a case similar to this one, Judge Kotelly of this Court opined: "it is now the universally held view of the intelligence community that Iran was responsible for the formation, funding, training, and management of Hizbollah." *Higgins v. The Islamic Republic of Iran*, Civ. A. No. 99–377 (D.D.C.2000). As well, Judge Jackson declared in *Anderson* that the defendants "financed, organized, armed, and planned Hizbollah operations in Lebanon and elsewhere." *Anderson*, 90 F.Supp.2d at 112; *see also Flatow v. The Islamic Republic of Iran*, 999 F.Supp. 1, 18 (D.D.C.1998) (Lamberth, J.) (finding that The Islamic Republic of Iran and the Iranian MOIS were liable under the doctrine of *respondeat superior* for the terrorist acts of the Palestine Islamic Jihad, whose source of funding was the government of Iran); *Eisenfeld v. The Islamic Republic of Iran*, 2000 WL 1918779, 2000 U.S. Dist. LEXIS 9545 (D.D.C.2000) (stating that "there is no question that Hamas, [an organization quite similar and related to Hizbollah] received massive material and technical support from the ... Islamic Republic of Iran").

hostages, which included beatings and rough treatment. These acts, which were intentionally committed by Jenco's captors, are attributable to the defendants because the defendants substantially funded and controlled Hizbollah. *See* Section I.B.2 and note 7, *supra.* As such, the defendants are liable under the tort doctrines of *respondeat superior* and joint and several liability. *See Flatow,* 999 F.Supp. at 26–27 (finding The Islamic Republic of Iran and the Iranian MOIS liable under the doctrines of *respondeat superior* and joint and several liability).

Thus, finding that Lawrence Jenco did indeed suffer a harmful contact, and that the acts causing such contact were attributable to the defendants, the Court finds the defendants liable for the battery of Jenco.

## 2. Assault

According to the Restatement (Second) of Torts, a defendant has committed an assault if "he acts intending to cause a harmful or offensive contact with [a] person, or an imminent apprehension of such a contact" and the person is "thereby put in such imminent apprehension." Restatement (Second) of Torts, § 21 (1965); *see also Truman v. U.S.,* 26 F.3d 592, 596 (5th Cir.1994); *Manning v. Grimsley,* 643 F.2d 20, 22 (1st Cir.1981).

Based upon the evidence presented in open court, the Court finds that Lawrence Jenco was put in an imminent apprehension of harmful or offensive conduct, and that the apprehension was the result of intentional acts attributable to both the Islamic Republic of Iran and the Iranian MOIS. The most notable instance of such conduct is the mock execution which the Hizbollah captors administered to Jenco. Such behavior has long been regarded as an archetypal assault. *See* Keeton et al.,

Prosser & Keeton on Torts, § 11, at 46 (5th ed.1984).

These acts, which were intentionally committed by Jenco's captors, are attributable to the defendants because the defendants substantially funded and controlled Hizbollah. *See* Section I.B.2 and note 7, *supra.* As such, the defendants are liable under the tort doctrines of *respondeat superior* and joint and several liability. *See Flatow,* 999 F.Supp. at 26–27 (finding The Islamic Republic of Iran and the Iranian MOIS liable under the doctrines of *respondeat superior* and joint and several liability).

## 3. False Imprisonment

According to the Restatement (Second) of Torts, "[a]n actor is subject to liability to another for false imprisonment if

(a) he acts intending to confine [a person] within boundaries fixed by the actor, and

(b) his act directly or indirectly results in such a confinement of the other, and

(c) the other is conscious of the confinement or is harmed by it.

Restatement (Second) of Torts, § 35 (1965); *King v. Crossland Sav. Bank,* 111 F.3d 251, 255 (2nd Cir.1997); *Richardson v. U.S. Dept. of Interior,* 740 F.Supp. 15, 26 (D.D.C.1990).

There is no question in the Court's mind, or anyone else's for that matter, that Lawrence Jenco was falsely imprisoned by Hizbollah for 564 days. Further, as explained above, *see* Section I.B.2 and note 7, *supra.,* these acts are attributable to the defendants because the defendants substantially funded and controlled Hizbollah. As such, the defendants are liable under the tort doctrines of *respondeat superior* and joint and several liability. *See Flatow,* 999 F.Supp. at 26–27 (finding The Islamic

Republic of Iran and the Iranian MOIS liable under the doctrines of *respondeat superior* and joint and several liability).

### 4. Intentional Infliction of Emotional Distress

■ According to the Restatement (Second) of Torts, "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." Restatement (Second) of Torts, § 46 (1986); *see also Holbrook v. Lobdell–Emery Mfg. Co.*, 219 F.3d 598, 600 (7th Cir.2000); *Ross v. Saint Augustine's College*, 103 F.3d 338, 343 (4th Cir.1996).

With respect to Fr. Jenco himself, the Court has little hesitation concluding that he suffered severe emotional distress at the hands of his captors, Hizbollah. The conduct of Hizbollah, in taking someone hostage for 564 days quite easily qualifies as extreme and outrageous. Further, there was substantial testimony as to the extreme stress of captivity, which even continued once Father Jenco was freed. *See* Feb. 15, 2001, Tr. at 5. Finally, as explained above, *see* Section I.B.2 and note 7, *supra.*, these acts are attributable to the defendants because the defendants substantially funded and controlled Hizbollah. As such, the defendants are liable under the tort doctrines of *respondeat superior* and joint and several liability. *See Flatow*, 999 F.Supp. at 26–27 (finding The Islamic Republic of Iran and the Iranian MOIS liable under the doctrines of *respondeat superior* and joint and several liability).

With respect to the Fr. Jenco's six siblings, the Court finds that the defendants are liable for their emotional distress. First, there is significant evidence of emotional distress among the siblings. Joseph Jenco, Fr. Jenco's brother testified as to the great strain the captivity imposed on himself as well as his brothers and sisters.

*See* Feb. 15, 2001, Tr. at 4–5, 19. As well, other witnesses testified as to the stressful and extensive publicity campaign, Tr. at 18–19, 30–32; the stress of false alarms that Fr. Jenco had ben killed or freed, Tr. at 1; and constant fear that the campaign to free Fr. Jenco might also end up hurting him and the other hostages. Tr. at 27.

Second, the Court finds that the defendants either intended such distress to result, or acted in callous disregard of the risk that such distress would result. As the Court reasoned in *Sutherland v. The Islamic Republic of Iran*, 151 F.Supp.2d 27, 50 (D.D.C.2001), "when an organization takes someone hostage, it is implicitly intending to cause emotional distress among the members of that hostage's immediate family." Thus, consistent with the reasoning in *Sutherland*, and the authority cited therein, the Court finds that Fr. Jenco's siblings suffered the tort of intentional infliction of emotional distress.

With regard to the emotional distress claims of Fr. Jenco's 22 nieces and nephews, the Court finds that they may not recover. In deciding emotional distress claims under federal common law, the Court has, for the most part, followed the Restatement (Second) of Torts. Section 46 of the Restatement (Second), entitled "Outrageous Conduct Causing Severe Emotional Distress", states:

> Where [extreme and outrageous] conduct is directed at a third person, the actor is subject to liability if he intentionally of recklessly causes severe emotional distress
>
> (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
>
> (b) to any other person who is present at the time if such distress results in bodily harm.

Restatement (Second) of Torts § 46 (1965). In *Sutherland,* the Court parted somewhat from the Restatement by permitting Thomas Sutherland's wife, Jean Sutherland, to recover for the severe distress she suffered during and after her husband's 6½ years of captivity. Although she was in Beirut for most of the 6½ years, it cannot be said that she was actually "present" at her husband's exposure to extreme and outrageous conduct. Nonetheless, the Court permitted her recovery because the defendants' intent to distress her was quite implicit in the nature of the defendants' conduct. In this respect, the holding was squarely on point with the analysis of the leading and most recent tort treatise:

> If the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability.

Dan B. Dobbs, The Law of Torts § 307, at 834 (2000).

Nonetheless, that treatise itself admits that some lines must be drawn, if, for example, "millions of people who are not present . . . watch the torture or murder of the President on television." *Id.* In hostage cases, this Court finds that the line is best drawn according to the plaintiff's relationship with the victim of the outrageous conduct. That is, to collect for intentional infliction of emotional distress in cases such as this one, the plaintiff need not be present at the place of outrageous conduct, but must be a member of the victim's immediate family.[8]

The Court draws the line with respect to family relationship (and not presence) for two reasons. First, hostage cases are unique in that they implicitly involve a physical separation of the plaintiff from the victim of the outrageous conduct. As a matter of fact, a plaintiff's lack of presence is the *exact source* of his emotional distress. Thus, if the Court were to limit recovery in hostage cases using a "presence" test, plaintiffs would never recover despite there being extremely strong evidence of significant emotional suffering.

Second, comparing the presence test to the family relationship test, courts have been more willing to stretch the boundaries of presence than family relationship. Thus, while presence has often been found where the plaintiff merely had "substantially contemporaneous knowledge", *see Nancy P. v. D'Amato,* 401 Mass. 516, 517 N.E.2d 824 (1988) (equating presence with "substantial contemporaneous knowledge of the outrageous conduct"), family relationship has been found lacking in unmarried cohabitants and present in married but separated spouses. *See Elden v. Sheldon,* 46 Cal.3d 267, 250 Cal.Rptr. 254, 758 P.2d 582 (1988) (finding family relationship lacking among co-habitants); *Planned Parenthood, Inc. v. Vines,* 543 N.E.2d 654 (Ind.App.1989) (finding family relationship intact despite spousal separation).

Applying the family relationship test to the claims of Fr. Jenco's nieces and nephews, the Court finds that their claims must fail. In deciding as such, the Court bears in mind the tremendous impact that Fr. Jenco's detention had on his nieces and nephews. As mentioned above, Fr. Jenco was sorely missed in his role as friend, uncle, and priest. Moreover, the effort to free Fr. Jenco caused further suffering in the many family events that went un-celebrated, or even unnoticed. But the Court

---

8. This Court defines one's immediate family as his spouse, parents, siblings, and children. This definition is consistent with the traditional understanding of one's immediate family.

*See* Dan B. Dobbs, The Law of Torts, § 310 (2000) (addressing the scope of recovery in consortium claims).

also must bear in mind the realities of tort law and the necessity of limiting recovery to a definable scope of individuals.

\* \* \* \* \* \*

Having found the defendants liable on the counts described above, the Court next proceeds to the calculation of damages.

## C. Damages

The Foreign Sovereign Immunities Act specifically permits plaintiffs suing under section 1605(a)(7) to pursue "money damages which may include economic damages, solatium, pain, and suffering." 28 U.S.C. § 1605 note. After reviewing the arguments presented by the plaintiffs, and the law applicable thereto, the Court makes the following conclusions regarding damages.

### 1. Compensatory Damages

#### (a) Fr. Jenco

■ The Estate of Lawrence M. Jenco seeks compensatory damages for his battery, false imprisonment, emotional distress, economic loss, and loss of consortium. Based on the testimony presented in open court, the Court finds Fr. Jenco entitled to $5,640,000.

In setting Fr. Jenco's damages at $5,640,000, the Court follows the formula which has evolved as a standard in hostage cases brought under section 1605(a)(7). This formula grants the former hostage roughly $10,000 for each day of his captivity. Thus, Terry Anderson, a co-hostage of Fr Jenco's who was detained for 2,540 days was awarded $ 24,540,000. *See*

*Anderson,* 90 F.Supp.2d at 113. Similarly, Joseph Cicippio, who was held hostage by Hizbollah for 1,908 days, received $20,000,000; Frank Reed, who was held hostage by Hizbollah for 1,330 days received $16,000,000; and David Jacobson, who was held hostage by Hizbollah for 532 days received $9,000,000. *See Cicippio,* 18 F.Supp.2d at 64, 70.

Any skepticism about the adequacy of this formula must overcome the steep presumption that Congress has tacitly approved its use. In all of the above cases, the formula was developed and applied *prior* to October 28, 2000. On that day, Congress enacted the Victims of Trafficking and Violence Protection Act of 2000. The Act obligated the United States Treasury to pay terrorist victims—including the hostages described above—the amount awarded them at trial. Congress must be presumed to have been aware of the damages formula, and its failure to alter or amend it in any way amounts to a tacit approval of the scheme. *See Flood v. Kuhn,* 407 U.S. 258, 283–284, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972) (declining to overturn prior precedent where Congress "by its positive inaction" has allowed prior decisions to stand). Thus, this Court finds $5,640,000 to be an appropriate award for the Estate of Lawrence Jenco.

#### (b) Fr. Jenco's Siblings [9]

■ Fr. Jenco's four surviving siblings and the estates of his two deceased siblings seek damages for their emotional distress. Based on the testimony presented to the Court, the Court finds all siblings entitled to $1.5 million each.[10]

---

9. Having denied the emotional distress claims of Fr. Jenco's nieces and nephews, the Court also denies any claim for solatium damages. The Flatow Amendment, 28 U.S.C. § 1605 note, clearly contemplates solatium recovery as a measure of *damages,* not as an independent cause of action.

10. Although two of the siblings died prior Fr. Jenco, and would therefore be thought to collect less damages than other siblings, a closer analysis reveals this to be incorrect.

Fr. Jenco was returned to his family in July 1986. His brother, John F. Jenco died nearly nine years later, on March 25, 1995. Similar-

Out of the many cases brought by U.S. citizens against Iran for terrorist acts, only four have considered the issue of awarding damages to the victim's siblings. In each of those cases, the Court awarded damages to the siblings. In *Flatow v. The Islamic Republic of Iran*, 999 F.Supp. 1, 32 (D.D.C.1998), a case involving the bombing death of Alisa Flatow in Israel, this Court awarded $2.5 million to each of Alisa's siblings. Similarly, in *Eisenfeld v. The Islamic Republic of Iran*, 2000 WL 1918779 (D.D.C.2000), another bombing case resulting in the deaths of two U.S. citizens, this Court awarded $2.5 million to each of the victims siblings. Finally, in *Elahi v. The Islamic Republic of Iran*, 124 F.Supp.2d 97, 109–12 (D.D.C.2000), a case involving the assassination of a U.S. citizen, Judge Joyce Hens Green awarded each of the victim's siblings $5 million. Particularly compelling to the Court in *Elahi* was the finding that, although only a sibling, the victim in fact fulfilled the role of father for his brothers, resulting in an extraordinarily close relationship.

In the case at hand, there has been extensive testimony as to the grief that Fr. Jenco's siblings suffered during, and to some extent after, his captivity. There has also been repeated testimony as to the family's special pride in having a Roman Catholic priest as a family member, as well as special enjoyment in having him perform sacraments for the family. These factors suggest that the siblings' damages in this case should approach the damages in *Elahi*, where there was demonstrative

evidence of a very special relationship between the victim and his siblings.

This case however is distinguishable from *Elahi*, as well as *Flatow* and *Eisenfeld*, in that Fr. Jenco returned alive to be with his family for nearly a decade before his death. Without underestimating the grief suffered while Fr. Jenco was in captivity, or the grief that accompanied the change in his disposition after his return, it was surely a monumental relief to have him back home in Joliet. The Court has little doubt that the siblings in *Flatow, Eisenfeld,* and *Elahi* would pay substantial sums just to have a single day spent with their deceased sibling. Thus, the safe return of Fr. Jenco after his captivity cannot be underestimated.

## 2. Punitive Damages

■ The Court is finally faced with issue of whether punitive damages should be levied against the defendants. According to the Restatement (Second) of Torts, such damages are merited in cases involving "outrageous conduct." *See* Restatement (Second) of Torts, § 908(1) (1965). In the case at hand, the Court has little hesitation finding that the depraved and uncivilized conduct of The Islamic Republic of Iran and the Iranian MOIS qualifies as outrageous conduct. As the Court found in *Sutherland v. The Islamic Republic of Iran,* the defendants' conduct

> would seem to be the quintessential embodiment of outrageousness. They stole a human being from his family and—for [over a year]—blindfolded him, chained

ly, Fr. Jenco's sister, Verna Mae Mihelich, died May 5, 1996. Finally, only a couple months later, on July 19, 1996, Fr. Jenco himself died.

The Court finds that the substantial majority of suffering over Fr. Jenco's captivity occurred during his captivity and in the years immediately following his return. Thus, although two siblings are deceased, all of the

siblings likely suffered similar amounts. To hold otherwise would be to hold that the remaining four siblings suffered a particularized grief after 1996 that was directly caused by the captivity and concurrently not related to Fr. Jenco's death. While this, of course, is possible, there has been very little (if any) testimony on this aspect of damages.

him, beat him, and deprived him of adequate food, clothing, and medical care. In most places, it is unlawful to treat even a stray dog in such manner.

*Sutherland,* 151 F.Supp.2d at 51–52.

Thus, finding that punitive damages are merited, the Court proceeds to determine the appropriate amount. In determining the level of punitive damages to impose, a court is to look at four factors: "the character of the defendant's act; the nature and extent of harm to plaintiff that the defendant caused or intended to cause; the need for deterrence; and the wealth of the defendant." *Flatow,* 999 F.Supp. at 32 (citing Restatement (Second) of Torts § 908(1)-(2) (1965)). With regard to the first factor, the Court has just noted the exceedingly heinous nature of the Iranian MOIS's acts. With regard to the second factor, the far-reaching and long-lasting damages caused by these acts were explained above in the Court's Finding of Facts.

With regard to deterrence, there is a mixture of opinion whether a monetary penalty from a United States court will have a deterrent effect on the Iranian MOIS's behavior. Some argue that the Iranian MOIS operates in an extrajudicial world, and that judicial penalties will therefore be ineffectual; others argue that the MOIS's extrajudicial behavior is exactly the reason to levy greater and greater penalties on the them. A third view was proffered by Dr. Clawson at trial: the failure to impose substantial punitive damages after several previous impositions might be construed by MOIS as a capitulation by the United States in the debate over the legitimacy of hostage-taking. As such, the failure to impose punitive damages might actually be construed as a condonation of MOIS's rogue behavior. *See* Tr. at 74.

Finally, with regard to the wealth of the defendants, the Court finds the defendants quite wealthy. As explained above, the Iranian MOIS has approximately 3000 employees and is the largest spy organization in the Middle East. As Dr. Clawson testified at trial, the Iranian government funnels most of its terrorist dollars, somewhere near $100 million annually, through the Iranian MOIS. *See* Tr. at 61. This suggests that not only is the Iranian MOIS wealthy, but the Iranian government, its supporter, is at least as large and wealthy. Thus, at the very minimum, the defendants are undoubtedly in possession of many hundreds of millions dollars.

The Court, guided by Dr. Clawson's expert opinion as well as previous decisions on substantially similar cases, finds $300,000,000 in punitive damages to be merited. That amount is thrice the annual funding provided by the Iranian government to MOIS. Not only is Dr. Clawson's expert opinion persuasive, the Court is not at all convinced that punitive damages are wholly ineffectual. Previous cases awarding punitive damages against MOIS have only been decided in the past three years. Since that time, there have been no reported hostage incidents involving Hizbollah and United States nationals. Further, it is doubtful that the full punitive effect of the prior damage awards have yet taken hold. The process of collecting an international debt is a long and laborious process, and it is therefore quite possible that the deterrent effect of the fines has yet to be fully felt.

Further, $300 million is an amount consistent with the punitive damages levied several times in the past. *See Anderson,* 90 F.Supp.2d at 114 (awarding $300 million in punitive damages against MOIS for the kidnapping and detention of Terry Anderson); *Flatow,* 999 F.Supp. at 34 (awarding $225 million—three times Iran's

reported expenditure on terrorist activities—to the estate of a terrorist victim).

## III. CONCLUSION

Today, the Court hopes to make whole, as much as legally possible, those hurt by the captivity of Fr. Jenco. Although judicial remedies will greatly support the plaintiffs' recovery, full recovery can only be attained by each plaintiff in his own way. Perhaps the words of Fr. Jenco himself are most appropriate on this issue. In an interview after his release, Fr. Jenco recalled his attempt at keeping a set of clothes clean so that he could wear them on the day of his release. He ultimately failed in this effort, but nonetheless garnered strength from it.

And those are the interesting things, clean things in life, you know, there's symbolism to it. That I was clinging to. After a while, I just gave it up, gave up the whole idea up. I was down to a button at the end. And I just threw it away and I said to God you can have the button, and that was kind of the break for me. To cling to nothing. And I've learned now not to cling to [any]thing.

Jenco Interview, June 24, 1988, at 93–94.

Thus, for the foregoing reasons, the Court finds that defendants shall be jointly and severally liable to the following entities for the following compensatory damages:

| | |
|---|---|
| The Estate of Fr. Jenco | $ 5,640,000 |
| The Estate of John F. Jenco | $ 1,500,000 |
| The Estate of Verna Mae Mihelich | $ 1,500,000 |
| Joseph M. Jenco | $ 1,500,000 |
| Elizabeth J. Blair | $ 1,500,000 |
| Mary S. Francheschini | $ 1,500,000 |
| Richard G. Jenco | $ 1,500,000 |

Further, the defendants shall be jointly and severally liable to estate of Lawrence M. Jenco for $300,000,000 in punitive damages. A separate order consistent with this Opinion shall issue this date.