Beverly SURETTE, Plaintiff,

v.

THE ISLAMIC REPUBLIC OF IRAN, et al. Defendants.

No. CIV.A.01–0570(PLF).

United States District Court, District of Columbia.

Nov. 1, 2002.

As Amended Nov. 4, 2002.

John Joseph McDermott, Hall, Estill, Hardwick, Gable, Golden & Nelson, Washington, DC, for plaintiff.

## OPINION

PAUL L. FRIEDMAN, District Judge.

On March 16, 1984, William Buckley, an American citizen and high-ranking agent of the Central Intelligence Agency, was kidnaped from the garage of his apartment building in Beirut, Lebanon. Buckley was held captive for the next 444 days—over fourteen months—during which he was interrogated, tortured and denied medical care, ultimately causing his death from severe illness on June 3, 1985. Plaintiff Beverly Surette, Buckley's longtime companion, brings this action on behalf of William Buckley's estate, herself and Buckley's sister, Maureen Moroney. She seeks compensatory and punitive damages for Buckley's abduction, torture and wrongful death and for loss of solatium. Defendants are the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps ("RGC") and the Iranian Ministry of Information and Security ("MOIS"), all of which are alleged to be responsible for funding and directing these terrorist acts against William Buckley.[1]

The Court has jurisdiction over this case under 28 U.S.C. § 1330(b) and pursuant to a 1996 amendment to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.* ("FSIA"), which provides an exception to the general rule of sovereign immunity for foreign states, authorizing claims based on "personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, *or the provision of material support or resources ... for such an act* if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment or agency ...." 28 U.S.C. § 1605(a)(7) (emphasis added).

Plaintiff effected service on defendants on September 24, 2001 through diplomatic channels, in accordance with the procedures of the FSIA. *See* 28 U.S.C. § 1608(a)(4); Notice of Service of Process, November 13, 2001. Following defendants' failure to appear, the Clerk of the Court entered default against defendants on December 5, 2001 pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. Notwithstanding the Clerk's entry of default, the Court cannot enter default judgment against a foreign state or its agencies or instrumentalities unless a plaintiff "establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). Accordingly, the Court held an *ex parte* evidentiary hearing—effectively a trial—on September 3 and 4, 2002, at which plaintiff presented evidence on the merits of her claim. The following witnesses testified at trial: plaintiff Beverly Surette, administrator of William Buckley's estate and his longtime companion; Maureen Moroney, Buckley's sister; Chip Beck, a retired CIA officer and long-time friend and co-worker of Buckley's; David Jacobsen (by videotape), who was held hostage with Buckley; Dr. Patrick Clawson, Deputy Director of the Washington Institute for Near East Policy and an expert on Iranian sponsorship of terrorism; Dr. Bruce Tefft, a retired CIA officer and a consultant on terrorism; Norman Gardner, a former CIA agent, an investigator for the House Appropriations Committee and a long-time acquaintance and colleague of Buckley's; Dr. Richard Froede (by videotape), the medical examiner who conducted an autopsy of Buckley's remains; and John Devlin, a CPA, who performed a lost income analysis.

Based upon the evidence presented and the applicable law, the Court finds that

---

**1.** While additional defendants were named in the initial complaint, service was effected on only three defendants, and thus only these three remain.

defendants are liable for the abduction, torture and wrongful death of William Buckley and for the loss of solatium asserted and will award damages to plaintiff on behalf of Buckley's estate, herself and Buckley's sister, Maureen Moroney. In support of this judgment, the Court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. Buckley's Abduction, Torture and Death

In early 1984, William Buckley was serving as station chief for the Central Intelligence Agency in Beirut, Lebanon. As the highest-ranking CIA official in Beirut—his position an "open secret" within the official Lebanese government and among violent religious factions vying for power—Buckley faced enormous risk to his life and safety every day. At the time, Beirut was one of the most violently turbulent places in the world, characterized by constant danger in many forms—ambushes, terrorist attacks, artillery barrages, snipers, kidnapers, assassins and traitors. In the words of Chip Beck, a longtime friend and fellow CIA agent who worked with Buckley in Lebanon just before his kidnaping, life in Beirut in 1984 was "sheer insanity."

On March 16, several men seized William Buckley in the underground garage of his apartment and pushed him into a van. The details of what followed are unknown, since Buckley himself did not live to tell the story. Based on the testimony of David Jacobsen, however, another American kidnaped in Beirut in May 1985 and held captive with Buckley, it is certain that Buckley's ordeal was horrific. Buckley and other hostages were confined for months in a filthy room where they were chained to the floor almost all hours of the day, blindfolded and wearing little clothing. The hostages were directed not to talk to each other. Their captors gave them scant food and water and their diet was so poor that it induced painful stomach cramps and diarrhea. With chains holding them immobile and guards reluctant to release them even for trips to the bathroom, the hostages suffered excruciating pain. Jacobsen testified that at some point, each of the hostages lost control of his bowels and was forced to defecate on himself, enduring a dehumanizing and humiliating experience.

In addition to these inhumane living conditions, Buckley endured the constant sense of terror and uncertainty that looms over every hostage. "We lived with death 24 hours a day," Jacobsen testified, recounting how their captors would charge into the room carrying weapons, force the hostages to line up against the wall and vow to kill them if anyone tried to rescue them. At other times, Buckley's captors would torment the hostages with promises that they were about to be released—a practice that further demoralized the hostages and chipped away at their sanity.

Beverly Surette and others testified that videotapes taken by Buckley's captors and later released to the United States showed Buckley with cuts and bruises on his face from being beaten; his nose had been "smashed over on the side of his face." See Plaintiff's Exhibit 15 (photograph of Buckley while in captivity corroborating this testimony). In addition, Buckley may have been subjected to even more gruesome abuse. While Buckley's remains, recovered years after his death, were far too decomposed to reveal much about his treatment in captivity, his remains were found with a catheter and a set of intravenous tubes with a butterfly valve—instruments that might have been used for torture. Both the medical examiner that performed Buckley's autopsy and Dr. Bruce Tefft, a retired CIA officer of 21 years, testified that the catheter could

have been used to cause extreme pain. Dr. Froede, the medical examiner, graphically explained how that could be done, and Dr. Tefft testified that such catheters are known to have been used as interrogation devices and instruments of torture by violent organizations, such as the KGB of the former Soviet Union. In addition, David Jacobsen testified that Buckley was given no medical care prior to his death, making it unlikely that the catheter was used for treatment purposes.

Under these conditions, Buckley's health deteriorated severely. Known throughout his life as a remarkably strong and healthy man, Buckley grew weak and severely ill in captivity. In the videotapes taken of him while a hostage, Buckley looked totally unlike himself—witnesses testified that one video showed Buckley slumped in a chair and appearing frail, hollow and vacant, seemingly unaware of what was happening or even where he was. David Jacobsen personally witnessed Buckley's desperate condition in captivity and testified that Buckley was gravely ill by the time Jacobsen joined him in captivity in May of 1985, fourteen months after Buckley's kidnaping. In the small apartment where Jacobsen, Buckley and other hostages were held, Jacobsen could not see Buckley because he was blindfolded, but could hear him through the plywood partitions that separated them. Jacobsen was able to identify Buckley as one of the other hostages because Jacobsen had been aware of other kidnapings in Beirut prior to his own, including Buckley's; when he heard the captors refer to another hostage as "William," Jacobsen identified that hostage as Buckley. Jacobsen testified that when he heard Buckley suffering, he knew that Buckley was dying.

William Buckley died in captivity on June 3, 1985. Jacobsen was able to identify the precise date of Buckley's death because, he testified, the first thing a hostage learns is to keep track of the date, since this is the hostage's only link to reality, "your lifeline to sanity." On the day he died, Buckley had dry heaves and a steady cough. Jacobsen recalled that Buckley must have been running a high fever because he became delusional, remarking to another hostage as he was led past: "I think I'll have my hotcakes now, with blueberry syrup." Although the captors knew of Buckley's grave condition and even asked Jacobsen what they might do to help him, they did not act on Jacobsen's suggestions to give Buckley lots of water and antibiotics or to bathe him in cool water to lower his temperature. Instead, the captors did nothing. Later that night, Jacobsen heard a low gurgling noise from Buckley that he described as "the death rattles." Finally, Jacobsen heard a "tap" through the partition, followed by silence. Though he could not be sure, Jacobsen understood the "tap" to be a gun fired with a silencer, and when he later was moved into Buckley's area of the room, Jacobsen saw a bullet hole in the wall 12 to 24 inches above the floor.

Based on the extensive evidence that Buckley was unlawfully abducted and held for over fourteen months in cruel, inhumane conditions, denied sufficient food and water, subjected to constant and deliberate demoralization, physically beaten, possibly subjected to gruesome physical torture, and denied essential medical treatment, the Court concludes that Buckley was tortured within the meaning of the FSIA. *See Daliberti v. Republic of Iraq*, 146 F.Supp.2d 19, 25 (D.D.C.2001) (finding that hostages had been tortured within the meaning of the FSIA where captors had held them at gunpoint, threatened to injure them if they did not confess, pointed loaded guns at them, denied them medical treatment, and incarcerated them in a room with no bed, window, light, electricity, water, toilet or adequate access to sani-

tary facilities); *Jenco v. Islamic Republic of Iran*, 154 F.Supp.2d 27, 32 (D.D.C.2001) (finding that deprivation of adequate food, light, toilet facilities and medical care for 564 days amounted to torture within the meaning of Section 1605(a)(7)).[2] Furthermore, the Court finds that these conditions caused and exacerbated Buckley's severe illness and, ultimately, caused his death.

### B. The Role of Iran, the RGC and the MOIS

Responsibility for Buckley's kidnaping was claimed by a group known as "Islamic Jihad," a recognized alias of "Hizballah," which is a terrorist organization based in Lebanon and known to be dependent on the resources, training and direction of Iran, the MOIS and the RGC. *See* Plaintiff's Exhibit 6, *Terrorist Group Profiles*, United States Department of State ("State Dep't.") at 15 (November 1988).[3] The connection between Hizballah and Iran is documented in numerous United States government reports and was confirmed by plaintiff's experts at the evidentiary hearing. Dr. Patrick Clawson, Deputy Director of the Washington Institute for Near East Policy and a long-time analyst of Iran and its policies, stated that "there is no question that Hizballah was directed, formed, organized and funded by the Iranian government." Dr. Bruce Tefft testified that Iran established Hizballah and trained its members in Lebanon.

At the time of Buckley's kidnaping Hizballah was under the immediate supervision of the Iranian government, and the approval process for Hizballah operations was extremely tight. Dr. Clawson testified that Hizballah's reliance on Iran was so complete that Hizballah would not and could not have kidnaped and abused Buckley without direction from Iran. Moreover, both Dr. Clawson and Dr. Tefft noted that the United States negotiated directly with Iran to seek the release of Buckley and

**2.** The FSIA adopts the following definition of "torture" from the Torture Victim Protection Act of 1991:

any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

Pub.L. No. 102–256, 106 Stat. 73, § 3(b)(1) (1992) (codified at 28 U.S.C. § 1350 note § 3(b)); *see* 28 U.S.C. § 1605(e)(1) ("[T]he terms 'torture' and 'extrajudicial killing' have the meaning given those terms in section 3 of the Torture Victim Protection Act of 1991."). Similarly, the FSIA adopts by reference the following definition for "hostage taking" from the International Convention Against the Taking of Hostages:

Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offense of taking of hostages ("hostage taking") within the meaning of this Convention.

International Convention Against the Taking of Hostages, Dec. 17, 1979, art. 1, T.I.A.S. No. 11, 081; *see* 28 U.S.C. § 1605(e)(2) ("[T]he term 'hostage taking' has the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages.").

**3.** As other courts have noted, the name "Hizballah" has multiple spellings. For purposes of this opinion, this Court adopts the spelling used by plaintiff and the United States Department of State. *See* Plaintiff's Exhibits 3–5, *Patterns of Global Terrorism 1984–86*, State Dep't.

other hostages, not with Hizballah or any other organization. Norman Gardner, a former CIA officer serving in the Office of Correctional Affairs when Buckley was kidnaped, testified that when videotapes of Buckley in captivity were released to the United States, they came from Iran. In addition, David Jacobsen testified that a man named Ali, who had "absolute authority" over the guards where Jacobsen and Buckley were held, was Iranian: "There is no doubt Ali was the Iranian representative to the kidnaping group." Based on all of this evidence, the Court finds that Iran was responsible for what happened to Buckley.

Two specific agencies of the state of Iran—the Revolutionary Guard Corps and the Ministry of Information and Security—also clearly played a role in Buckley's abduction, torture and death. Dr. Clawson testified that the RGC, formed in 1979 during the Iranian Revolution and charged with promoting and protecting the interests of the Islamic Republic, maintains a strong military force in Lebanon and is responsible for training and supplying weapons to Hizballah for terrorist operations. The central role of the RGC in supporting and directing Hizballah terrorism is described in numerous reports by the State Department and is understood to be a crucial element of Iran's mission to export the Islamic revolution and drive Western influence out of the Middle East. *See Patterns of Global Terrorism 1986* at 22; Plaintiff's Exhibit 7, *Iran's Use of International Terrorism*, State Dep't. at 1 (October 1987); *see also Higgins v. Islamic Republic of Iran*, Civ. No. 99–0377, 2000 WL 33674311, *7 (D.D.C.2000).

The Iranian Ministry of Information and Security also is well known in its support of Hizballah, as Dr. Clawson confirmed in his testimony. Essentially the continuation of the secret police force under the Shah (SAVAK), the MOIS was renamed after the revolution but continued as a formal part of the new government to oversee massive spy operations both internally and abroad. *See Global Patterns of Terrorism 1986* at 22. Continuing through the present, the MOIS and the RGC work in conjunction to oversee and direct terrorist activities throughout the Middle East, including the operations of Hizballah in Lebanon. Around the time that Buckley was kidnaped, Dr. Clawson testified, Iran provided between $50 million and $200 million each year to Hizballah for terrorist activities and the evidence is clear that the RGC and the MOIS were the agencies that directed and applied those funds.[4]

As other judges of this Court have found in similar cases brought under the FSIA, the Court finds the evidence conclusive that the Islamic Republic of Iran and its agencies, the RGC and the MOIS, are ultimately responsible for the kidnaping, abuse and wrongful death of William Buckley. *See, e.g., Jenco v. Islamic Republic of Iran*, 154 F.Supp.2d at 33 (finding that Iran and the MOIS provided "material support or resources" to Hizballah for kidnaping of Father Lawrence Jenco in Beirut, Lebanon in 1985); *Higgins v. Islamic Republic of Iran*, 2000 WL 33674311 at *7 (holding Iran and its "Islamic Revolutionary Guard" liable for funding, training and providing equipment for Hizballah and noting that in 1988, Iran "virtually directed the terms and conditions under which hostages would be held or released."); *see also Anderson v. Islamic Republic of Iran*, 90 F.Supp.2d 107, 112–13 (D.D.C.2000); *Cicippio v. Islamic Repub-*

---

4. Dr. Bruce Tefft in his testimony put the figure that was regularly provided by Iran to Hizballah at $100 million per year.

*lic of Iran,* 18 F.Supp.2d 62, 68 (D.D.C. 1998).

## II.  CONCLUSIONS OF LAW

### A.  Liability

■ Based on this evidence, the Court finds that defendants are liable under Section 1605(a)(7) of the FSIA, because all the requisites of that section have been satisfied.  It is undisputed that William Buckley suffered both personal injury and death as a result of being taken hostage and tortured.  The Court is without doubt that Iran, the RGC and the MOIS provided "material support" and "resources" for Hizballah's kidnaping, torture and wrongful killing of Buckley, depriving them of the immunity normally accorded foreign states and their agencies or instrumentalities under the FSIA. *See* 28 U.S.C. § 1605(a)(7).  In addition, as required by the FSIA, Iran was designated as a state sponsor of terrorism at the time of Buckley's kidnaping and torture (as it has been ever since), and Buckley was a United States citizen.  *See* 28 U.S.C. §§ 1605(a)(7)(A), (B)(ii); *Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 14 (D.D.C.1998).  Finding that all requirements of Section 1605(a)(7)have been met, the Court holds that defendants are liable for the abduction, torture and wrongful death of William Buckley.

### B.  Damages

■ The FSIA, as amended, specifically authorizes the award of damages under Section 1605(a)(7) in the form of "economic damages, solatium, pain, and suffering."

28 U.S.C. § 1605 note.  In conformity with previous cases decided in this district, the Court will apply federal common law to calculate damages on plaintiff's claims. *See Flatow v. Islamic Republic of Iran,* 999 F.Supp. at 14–15 (applying federal common law to calculate relief after engaging in choice of law analysis);  *see also Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d 78, 87 (D.D.C.2002);  *Wagner v. Islamic Republic of Iran* 172 F.Supp.2d 128, 134 (D.D.C.2001);  *Jenco v. Islamic Republic of Iran,* 154 F.Supp.2d at 33.

■ Here, plaintiff seeks compensatory damages on behalf of Buckley's estate for Buckley's wrongful death and *ante-mortem* pain and suffering while in captivity and before death.  In addition, plaintiff seeks to recover solatium damages for the emotional anguish suffered by herself and Maureen Moroney as a result of Buckley's abduction, torture and death.[5]  Plaintiff also asks the Court to award punitive damages against the RGC and the MOIS for their material support of Hizballah.[6]  Based on the applicable law and the evidence presented, the Court will award the following damages.

#### 1.  *Wrongful Death*

■ To recover on her claim for wrongful death, plaintiff must demonstrate that defendants caused Buckley's death and that the killing was wrongful.  *See Flatow v. Islamic Republic of Iran,* 999 F.Supp. at 27 (adopting elements of the District of Columbia's wrongful death statute, D.C.Code Ann. § 16–2701).  As discussed above, the evidence is conclusive that de-

---

**5.** "Solatium" is defined as compensation "for hurt feelings or grief."  BLACK'S LAW DICTIONARY 1397 (7th Ed.1999).  In the context of FSIA cases, this Court has recognized the claim of solatium as recoverable under federal common law and "indistinguishable" from the claim of intentional infliction of emotional distress.  *Wagner v. Islamic Republic of Iran,* 172 F.Supp.2d at 135, n. 11.

**6.** Under the FSIA, punitive damages may not be assessed against a foreign state such as Iran, but may be assessed against agencies or instrumentalities of a foreign state such as the RGC and the MOIS. *See Anderson v. Islamic Republic of Iran,* 90 F.Supp.2d at 114.

**268**

fendants caused Buckley's death by providing material support and resources for Hizballah to abduct Buckley, torture him and deny him essential medical care. Furthermore, Buckley's death was undeniably wrongful, in that his captors had no legal basis for taking his life.

### a. Lost Income

■ Under a claim for wrongful death, Buckley's estate is entitled to recover for the economic loss that resulted from his killing, in particular damages for loss of prospective income. *See Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d at 87; *Flatow v. Islamic Republic of Iran,* 999 F.Supp. at 27.[7] In support of this claim, plaintiff presented the expert testimony of John Devlin, a CPA, who employed standard methods to calculate the approximate amount of income that Buckley would have earned had he not been killed. *See* Plaintiff's Exhibit 10, Letter from John Devlin to John McDermott, August 29, 2002, and attached report. Devlin began with Buckley's reported compensation on his federal income tax returns for the years 1984, 1985 and 1986, and assumed that Buckley would have continued to work until the age of 70. Devlin calculated an annual salary increase of 2.2% until the year that Buckley would have reached age 65, the government service retirement age. For the subsequent five years, Devlin assumed that Buckley would have worked in the private sector at a salary commensurate with that of others in similar positions from a similar background. From this amount Devlin deducted Buckley's estimated yearly expenses for personal consumption and payment of federal and state taxes. Based on these calculations, Devlin estimated the present value of Buckley's lost income to be $1,021,284, stating that this amount represented a very conservative approximation. Buckley's income in the private sector could have been a great deal higher based on his experience as station chief in Beirut, but Devlin did not have the information necessary to calculate that increase and chose to underestimate rather than overestimate. Finding Devlin's methods and computations eminently reasonable, the Court will award lost income damages to plaintiff, on behalf of Buckley's estate, in the amount of $1,021,284.

### b. Buckley's *Ante–Mortem* Pain and Suffering

Plaintiff also is entitled to recover damages on behalf of Buckley's estate for the great pain and suffering that Buckley undoubtedly endured before he died. *See Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d at 88; *Flatow v. Islamic Republic of Iran,* 999 F.Supp. at 27. It is, of course, impossible to place a monetary value on the physical and psychological suffering that Buckley endured. The damages awarded by judges of this Court in similar cases, however, provide the Court with a benchmark for its calculation. This district has developed a formula for awarding damages in cases where victims were held hostage by terrorist organizations and experienced the kind of pain and suffering that Buckley did. Subject to adjustment for cases deviating from the more common experience of victims, this Court typically has awarded former hostages or their estates roughly $10,000 for each day of captivity. *See Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d at 88–89; *Jenco v. Islamic Republic of Iran,* 154 F.Supp.2d at 37; *Anderson v. Islamic Republic of Iran,*

---

7. In recovering for wrongful death, Buckley's estate also is entitled to monetary damages for funeral expenses. *See Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d at 87 Since the government appropriately arranged for memorial services in Buckley's honor and a burial in Arlington National Cemetery, however, plaintiff does not seek to recover funeral expenses.

90 F.Supp.2d at 113. The Court finds this formula to be reasonable and notes that this was the analysis used to compensate other hostages held in the same facility as Buckley, including David Jacobsen, who lay near Buckley during the final moments of Buckley's life. *See Cicippio v. Islamic Republic of Iran,* 18 F.Supp.2d at 70.

Although many of the details of Buckley's experience are unknown, the evidence reliably suggests that Buckley suffered the same physical torture and moral degradation that his counterparts lived to describe—insufficient food and water; primitive conditions; constant shackling to a dirty floor; a poor diet inducing severe digestive problems that led to excruciating pain and humiliation; physical beatings; repeated interrogation; denial of urgent medical care; torturous threats of execution and promises of imminent release; and, perhaps worst of all, the constant uncertainty that looms over all hostages— the fear of death and the hope of rescue.

In addition to these hardships of captivity, Buckley suffered a second anguish, that of enduring his final moments alone physically and psychologically. As he lay shackled on a cold, dirty floor without comfort or care, feeling his characteristic strength leave him, Buckley must have known that he was about to die. Before he was kidnaped, Buckley foresaw such an experience and spoke of it with his long-time friend, Chip Beck. As Beck testified in Court, Buckley knew the dangers of his position in Beirut and feared that he would be kidnaped and tortured as had been his old mentor, Tucker Gougelmann, in Vietnam. Speaking with Beck just two weeks before his kidnaping, Buckley expressed his horror at the thought of dying in captivity: "I'd rather die in a botched rescue attempt than waste away or die like Tucker did in Vietnam. Try as hard as you can to push the bureaucracy to get me out of here." Buckley's nightmare came true, and despite his government's efforts to get him out, Buckley died slowly, painfully and alone, shackled to the floor of an apartment somewhere in Lebanon.

■ Taking into account the evidence of Buckley's suffering in captivity and just before his death, the Court awards $5,440,000 to his estate. This award is based on a calculation of $10,000 for each day that he was held hostage, amounting to $4,440,000, with additional compensation in the amount of $1,000,000 for the portion of that time that Buckley faced certain death alone. The Court finds this amount appropriate and consistent with previous awards for victims who endured the anguish of facing imminent death in captivity alone. *See Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d at 89 (awarding $1,000,000 to victim's estate for the several minutes after victim was shot and before he died); *Eisenfeld v. Islamic Republic of Iran,* 172 F.Supp.2d 1, 8 (D.D.C.2000) (awarding $1,000,000 each to two victims of suicide bombing who died quickly but not immediately after explosion). The length of Buckley's illness and his slow decline into death justify this award.

## 2. *Solatium* [8]

■ With respect to plaintiff's claims for solatium (on behalf of herself and Maureen Moroney), the Court again will follow

---

**8.** Although the claim of "solatium" is not recognized as such under D.C. law, such damages may be awarded under federal common law for mental anguish resulting from the loss of a decedent's society and companionship. *See Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d at 89; *Wagner v. Islamic Republic of Iran,* 172 F.Supp.2d at 135, n. 11 (noting that "[i]n an intentional homicide case" such as [a terrorist killing], "solatium appears in any event to be indistinguishable from the intentional infliction of emotional distress for which the District of Columbia does generally allow recovery in tort."). By relying on the Second Restatement of Torts,

the precedent set by other judges of this Court who have awarded such damages based on a showing of extreme and outrageous conduct that causes severe emotional distress to those close to a victim of terrorism. *See Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d at 89; *Wagner v. Islamic Republic of Iran*, 172 F.Supp.2d at 136, n. 11; *Jenco v. Islamic Republic of Iran*, 154 F.Supp.2d at 35–36. Because defendants' conduct was patently outrageous and the emotional distress caused to Beverly Surette and Maureen Moroney is undeniable, the Court finds that plaintiff is entitled to damages for solatium.

### a. Beverly Surette

As a threshold matter, the Court holds that Beverly Surette is eligible to recover damages for solatium despite the fact that she was never legally married to William Buckley. In similar cases brought under the FSIA, judges typically have awarded damages for solatium to members of a victim's immediate family, including not only a spouse but also parents, children and siblings, and have looked at the closeness of the relationship between the victim and the person seeking to recover. *See Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d at 89; *Jenco v. Islamic Republic of Iran*, 154 F.Supp.2d at 36, n. 8 (defining immediate family as spouses, parents, siblings and children); *Higgins v. Islamic Republic of Iran*, 2000 WL 33674311 at *7–8; *Flatow v. Islamic Republic of Iran*, 999 F.Supp. at 29–32 (enumerating factors for evaluating claim for solatium under FSIA). Although the Court is not aware of any case brought under the FSIA in which a court has

awarded solatium damages to a victim's partner to whom he or she is not legally married, the Court nonetheless concludes that such an award is appropriate in this case. This result is justified by the nature and closeness of the relationship between Beverly Surette and William Buckley for over twenty years, a bond that was the functional equivalent of a legal marriage. The strength of their "close emotional relationship," *Flatow v. Islamic Republic of Iran*, 999 F.Supp. at 30, was recognized by Buckley's family, his colleagues and his employer, and it merits recognition by this Court. For these reasons, the Court will treat Ms. Surette as if she were the legal spouse of William Buckley. Moreover, with respect to the merits of her claim for solatium, the Court finds ample evidence that Ms. Surette is entitled to an award.

Beverly Surette met William Buckley in 1961 at a Memorial Day parade in Lexington, Massachusetts. From the early 1960s until Buckley's death, he and Ms. Surette shared a home, first in Lexington and then in Concord, Massachusetts. After Buckley joined the CIA in 1965, his work required him to travel for substantial periods of time, but their time apart never interfered with the close relationship that Mr. Buckley and Ms. Surette enjoyed. Ms. Surette testified to the close bond that they shared, describing the letters, post cards, weekly or bi-weekly phone calls and audio tapes that kept them in touch whenever Buckley traveled. While Buckley was away, Ms. Surette lived in the house that Buckley owned, assuming the responsibilities of running the household while caring for her daughter from a previous marriage, Geraldine. Ms. Surette spoke of

which provides for damages against "one who by extreme or outrageous conduct intentionally or recklessly causes severe emotional distress to another," RESTATEMENT (SECOND) OF TORTS § 3 (1986), this Court has awarded damages for solatium to numerous plaintiffs in similar cases brought under the FSIA. *See*

*Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d at 89; *Wagner v. Islamic Republic of Iran*, 172 F.Supp.2d at 136–37; *Jenco v. Islamic Republic of Iran*, 154 F.Supp.2d at 37; *Anderson v. Islamic Republic of Iran*, 90 F.Supp.2d at 113.

Buckley's love and devotion to Geraldine, recalling that he treated Geraldine as if she were his own daughter, always sending money when there was a need, checks for her birthday and contributions to her college tuition. Similarly, Buckley's family welcomed Ms. Surette into their midst, always inviting her to family gatherings over the years. The closeness between Beverly Surette and William Buckley was evident throughout the more than twenty years that they were together, in a relationship that Buckley's sister described as "longstanding, loving, loyal and trusting."

When the CIA called on March 16, 1984 with news of Buckley's abduction, it was Beverly Surette whom they called. In that 2:30 a.m. telephone call that would change her life forever, Ms. Surette learned that Buckley had been seized near his apartment in Beirut and that the CIA did not know where he was. From then on, Ms. Surette was in constant contact with the CIA, flying frequently to Washington and speaking to the agency daily, but there was little information on Buckley's location or condition. When videotapes of Buckley were obtained, Ms. Surette viewed them at the CIA. Testifying in court years later, she recalled the sadness of seeing Buckley's face cut and disfigured, his eyes hollow and unfocused, his body weak. Of this image she said simply: "It was not my Bill, that's all."

The government arranged two services in Buckley's memory, one in 1988 when he was known to be dead but his remains had not been recovered and one in 1991 when his body was returned to the United States. Ms. Surette remembers the shock of seeing Buckley's casket removed from the military plane, realizing that she had always thought he would come home, that because Buckley was such a strong man,

she had always believed that he would escape somehow. Ms. Surette told herself over the years that she had to be strong and get through it. But as she testified to the Court, she will never forget what Buckley went through—it never leaves her. She testified that whenever there is a story on hostages on television or in the movies, it all comes back to her. She tries to remember the happy things, but to this day she still asks: "Why did they do this to him? He did not deserve it."

█ It is apparent from Ms. Surette's account of the intimacy she shared with William Buckley that she suffered a great loss during and after his abduction, torture and death. Based on the evidence before it, the Court finds that Ms. Surette is entitled to recover damages for solatium in the amount of $10,000,000. While no amount of money could ever truly compensate Ms. Surette for the agony she has suffered, the Court finds this to be a fair award, consistent with the relief awarded in similar cases by other judges of this Court. *See Anderson v. Islamic Republic of Iran,* 90 F.Supp.2d at 113 (awarding $10,000,000 in damages for solatium to spouse of journalist held hostage and tortured for 2,454 days); *Cicippio v. Islamic Republic of Iran,* 18 F.Supp.2d at 70 (awarding $10,000,000 each to two spouses of victims held hostage and tortured for 63 and 44 months, respectively); *Higgins v. Islamic Republic of Iran,* 2000 WL 33674311 at *7–8 (awarding $12,000,000 to spouse of victim held hostage, brutally tortured and murdered in captivity, based on "barbaric treatment" of victim that surpassed that of other hostages).

b. Maureen Moroney [9]

Maureen Moroney and her older brother, William Buckley, were remarkably

9. Although Maureen Moroney is not a named plaintiff in this action, plaintiff Beverly Sur-

ette nonetheless seeks to recover damages for solatium on behalf of Ms. Moroney. While

close, far closer to each other than either of them was to their other siblings. Ms. Moroney described their closeness not only as children but as adults, recalling a period after Bill's service in the Korean war when both lived in their parents' house and took pains to take a long walk together every day, despite their differences in age and interests. As he had with Ms. Surette's daughter, Buckley formed a strong relationship with Ms. Moroney's two daughters, whose own father had died years earlier. Ms. Moroney testified that her daughters came to rely on Buckley like a father and that Buckley had told them that he would always be there for them, in which they took great comfort. In one example of his connection to Ms. Moroney and her daughters, Buckley called them from Lebanon on February 11, 1984, roughly a month before he was kidnaped, to wish one daughter a happy birthday. This was the last time that Ms. Moroney would ever hear her brother's voice.

After she learned of her brother's kidnaping, Ms. Moroney, like Ms. Surette, traveled frequently to Washington to be briefed by CIA officials. She, too, viewed the videotapes of Buckley in captivity and was struck by Buckley's uncharacteristic weakness and disorientation, disturbed by the visible evidence of his abuse. In addition to the anguish of endless waiting and uncertainty, Ms. Moroney suffered the additional hardship of being harassed by the press, who had identified her as Buckley's sister while they had not been able to identify Ms. Surette as Buckley's spouse. The morning that she received word of her brother's abduction, Ms. Moroney was accosted at her doorstep and surrounded by reporters who bombarded her with questions, probed her for information and even asked her to view a videotape with them and share her response. The press approached her at home, at work and at funeral masses held for her brother. She described the seemingly endless media frenzy as a terrible invasion, so intrusive that she sometimes had to leave the house with her daughter and stay at a motel. Ms. Moroney was exhausted by trying to avoid the press, which only added to the stress of knowing that her brother was being held hostage by terrorists and that she might never see him alive again.

As time went by without news of Buckley's condition, Ms. Moroney continued to suffer the agony of the intrusive media. In a bookstore at one point, Ms. Moroney turned to see her brother's face on the cover of a book, which shook her completely. Ms. Moroney testified that the image made her want to vomit and faint. Yet she had no one to yell at, no one to blame

---

the Court ordinarily will not award damages to a non-plaintiff, the specific circumstances of this action permit such an award to plaintiff on behalf of Ms. Moroney. In similar cases brought in this district, judges have awarded damages to non-plaintiffs who demonstrated a sufficiently close connection to the victim of a terrorist act. *See Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d at 89, n. 18 (awarding damages to siblings of decedent even though only named plaintiffs were decedent's parents); *Higgins v. Islamic Republic of Iran,* 2000 WL 33674311 at *8 (awarding solatium to victim's daughter though not a named a plaintiff); *Flatow v. Islamic Republic of Iran,* 999 F.Supp. at 30 ("The testimony of sisters or brothers is ordinarily sufficient to sustain their claims for solatium."). In conformity with this practice, and in recognition of the unique circumstances of this action, the Court finds that plaintiff Beverly Surette may raise a claim for solatium on behalf of Ms. Moroney. For clarity on this point, plaintiff moved to amend the second sentence of paragraph 47 of the complaint, and the Court granted the motion, so that it now reads: "This action is brought by plaintiff Beverly Surette, Conservator of the Estate of William Buckley, deceased, on behalf of herself and the decedent's heirs-at-law, including Maureen Moroney."

for the invasion. By the time she and Ms. Surette got word that Buckley was dead—David Jacobsen pulled them aside at a gathering in November of 1986, just after his release, and told them that he personally had witnessed Buckley's death in captivity—both women found that they were relieved.

In speaking of the years that have passed since her brother's abduction and killing, as well as those that remain ahead, Ms. Moroney made clear that she will never escape the horror of this experience. She spoke of her children, who no longer have an uncle, and testified that the patriarch of her entire family now is gone. Like Ms. Surette, Ms. Moroney reports being constantly reminded of what happened. Whenever she sees anything on television that relates to hostages, she said, they invariably show a picture of her brother. It never stops.

█ Based on Ms. Moroney's testimony, it is apparent to the Court that she and her brother enjoyed a strong and lasting friendship as siblings. Accordingly, the Court will award damages for solatium on behalf of Ms. Moroney in the amount of $2,500,000, an amount supported by awards granted to siblings in similar cases in this district. *See Flatow v. Islamic Republic of Iran,* 999 F.Supp. at 32 (awarding $2,500,000 each to siblings of victim of suicide bombing); *Eisenfeld v. Islamic Republic of Iran, et al.,* 172 F.Supp.2d 1, 10–11 (D.D.C.2000) (same).

### 3. *Punitive Damages*

Plaintiff also seeks punitive damages against the RGC and the MOIS. As noted above, *see supra* at 12, n. 6, the FSIA expressly exempts a foreign state from liability for punitive damages, but permits punitive damages to be assessed against an "agency or instrumentality" of a foreign state. 28 U.S.C. §§ 1606; 1603(b).

█ As other judges of this Court have in the past, the Court concludes that punitive damages are warranted against the RGC and the MOIS in order to punish them for their role in the perpetration of these acts and to deter future terrorist activities to whatever extent possible. *See Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d at 92–93; *Anderson v. Islamic Republic of Iran,* 90 F.Supp.2d at 113–14; *Higgins v. Islamic Republic of Iran,* 2000 WL 33674311 at *8–9. Based on the evidence before the Court, it is beyond question that the RGC and the MOIS have instigated and supported terrorist activity for many years and continue to do so. *See Patterns of Global Terrorism: 1984* at 4, 11; *Patterns of Global Terrorism: 1985* at 7, 18; *Patterns of Global Terrorism: 1986* at 9–10, 22; *see generally Iran's Use of International Terrorism; see also Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d at 92. While the Court cannot hope to end their unconscionable acts by the entry of a single judgment, the award of punitive damages in a case such as this is both appropriate and necessary to punish defendants, if not to deter similar conduct in the future. The conduct of the RGC and the MOIS in relation to the abduction, torture and killing of William Buckley was cruel and depraved by any standard. No human being should have to endure what Buckley did for the last 444 days of his life, and none should have to die as he did—alone, in pain and deprived of his freedom. For these reasons, the Court concludes that the acts performed by these defendants merit an award of punitive damages.

Following the method used by several judges of this Court in similar cases, the Court will award punitive damages in an amount equal to roughly three times defendants' estimated annual budget for their support of terrorism. *See Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d at 92–93; *Anderson v. Islamic Republic of*

*Iran,* 90 F.Supp.2d at 113–14; *Higgins v. Islamic Republic of Iran,* 2000 WL 33674311 at *8–9. From the testimony of Dr. Clawson and Dr. Tefft it is apparent that the RGC and the MOIS spend approximately $100 million each year in support of the operations of Hizballah and its terrorist activities. Based on this estimate, the Court will assess punitive damages against defendants the Islamic Revolutionary Guard Corps and the Ministry of Information and Security, jointly and severally, in the amount of $300,000,000, to be awarded to plaintiff.

| | |
|---|---:|
| Estate of William Buckley (lost income): | $ 1,021,284 |
| Estate of William Buckley (pain and suffering): | $ 5,440,000 |
| Beverly Surette (solatium): | $10,000,000 |
| Maureen Moroney (solatium): | $ 2,500,000 |

It is FURTHER ORDERED that judgment be entered in favor of plaintiff Beverly Surette against the Iranian Ministry of Information and Security and the Islamic Revolutionary Guard Corps, jointly and severally, for punitive damages in the amount of $300,000,000; and it is

FURTHER ORDERED that plaintiff may, at her own expense, arrange for the Opinion issued this same day and this Judgment and Order to be translated into Farsi and cause copies of the translated Opinion and Judgment and Order to be transmitted to the United States Department of State for service upon defendants through diplomatic channels, pursuant to 28 U.S.C. § 1608(a)(4).

SO ORDERED.

A Judgment and Order consistent with this Opinion will be issued this same day.

SO ORDERED.

### JUDGMENT AND ORDER

For the reasons stated in the Opinion issued this same day, it is hereby

ORDERED that judgment be entered in favor of plaintiff Beverly Surette against the Islamic Republic of Iran and its Ministry of Information and Security and the Islamic Revolutionary Guard Corps, jointly and severally, for compensatory damages in the following amounts: